IN THE UNITED STATES DISTRICT COURT
FOR THE NORTHERN DISTRICT OF ILLINOIS
EASTERN DIVISION

| | | |
|---|---|---|
| Michael Francis McLoughlin, et al., | ) ) ) | |
| Plaintiffs, | ) ) ) | |
| v. | ) ) ) | No. 25 C 15135 |
| United States Citizenship and Immigration Service, et al., | ) ) ) ) | |
| Defendants. | ) | |

Memorandum Opinion and Order

Plaintiffs Michael McLoughlin and his wife Ester Mrutu have been trying since 2018 to induce the United States Citizen and Immigration Services to adjust Mrutu's status and grant her a green card. The agency has not obliged. McLoughlin and Mrutu filed suit in response to USCIS's October 2025 denial of their most recent attempt. Pending before me are the parties' cross-motions for summary judgement. For the reasons that follow, I grant both motions in part.

1

## I.

To become a lawful permanent resident and remain in the United States, a noncitizen must generally obtain an immigrant visa. *See* 8 U.S.C. §§ 1151-54. When a citizen marries a noncitizen, the citizen may file a form I-130 to petition the Attorney General to classify their spouse as an immediate relative, making them eligible for a visa. 8 U.S.C. §§ 1151(b)(2)(A)(i) (defining "immediate relative"), 1154(a)(1)(A)(i) (creating the petition procedure); 8 C.F.R. § 204.1(a)(1) (specifying the I-130 form). The noncitizen can then file a form I-485 petition for adjustment of status to lawful permanent resident, which means, if the petition is granted, a green card and a path to citizenship. 8 USC § 1255(a) (allowing the Attorney General to adjust status); 8 C.F.R. § 245.2 (detailing the I-485 petition process). USCIS evaluates forms I-130 and I-485 on behalf of the Attorney General. *See* 6 U.S.C. § 271(b).

A petitioner bears the burden of proving by a preponderance of the evidence that she is eligible for the benefit she seeks. *Matter of Brantigan*, 11 I. & N. Dec. 493, 495 (BIA 1966). Petitioners for spousal adjustment of status must prove that their marriage is both legal and "bona fide," meaning, in part, that it was not entered into for the sole purpose of evading the immigrations laws of the United States. *See Lutwak v. United*

*States*, 344 U.S. 604, 612-13 (1953). Attempts to evade immigration laws through matrimony can result in a permanent bar:

> [N]o petition shall be approved if (1) the alien has previously...sought to be accorded...status as the spouse of a citizen of the United States...by reason of a marriage determined by the Attorney General to have been entered into for the purpose of evading the immigration laws[.]

8 U.S.C. § 1154(c). To invoke this sham-marriage bar, USCIS must prove that the marriage at issue was fraudulent by "substantial and probative evidence." 8 C.F.R. § 204.2(a)(1)(ii). This burden is "higher than a preponderance of the evidence and closer to clear and convincing evidence." *Matter of Singh*, 27 I. & N. Dec. 598, 607 (BIA 2019).

This statutory setup creates two distinct scenarios that involve different standards of proof and, as a result, different standards on review. USCIS can deny a petition for adjustment on the basis of a sham marriage either *with* or *without* invoking the sham marriage bar. In the first scenario, only in the context of an I-130 petition, USCIS can simply find that the petitioners have not met their initial burden to prove that their marriage was not contracted for immigration purposes. *Flieger v. Nielsen*, 743 Fed. Appx. 684, 688-89 (7th Cir. 2018). In the second scenario, USCIS can deny *any* petition for adjustment, not just a marriage-based one, by proving that, either in the context of the pending petition or sometime in the past, the non-citizen petitioner

3

attempted to thwart the immigration laws by way of a sham marriage. *Matter of Singh*, 27 I. & N. Dec. 598, 606–07 (BIA 2019).

Petitioners prove their union is bona fide by showing that they intended to establish a life together at the time of their marriage. *See Yong Hong Guan v. I.N.S.*, 998 F.2d 1017 (Table), 1993 WL 265107, at \*2 (7th Cir. July 16, 1993). Evidence of intent includes "proof that the [noncitizen] has been listed as the petitioner's spouse on insurance policies, property leases, income tax forms, or bank accounts; and testimony or other evidence regarding courtship, wedding ceremony, shared residence, and experiences." *Matter of Laureano*, 19 I. & N. at 3. The "conduct of the parties after their marriage" is also relevant, "to the extent that it bears on the subjective intent of the parties at the time they were married." *Yong Hong Guan*, 1993 WL 265107, at \*2. Finally, only marriages contracted *solely* for immigration purposes are forbidden: "[A] good-faith marriage motivated only *in part* by immigration benefits is not illegal." *United States v. Edwards*, 869 F.3d 490, 495 n.1 (7th Cir. 2017) (citing *Eid v. Thompson*, 740 F.3d 118, 124 (3d Cir. 2014)) (emphasis in original).

Rather than denying an I-130 petition outright, USCIS can issue a Notice of Intent to Deny ("NOID"), which gives the petitioner an opportunity to cure the petition's defects. *See* 8 C.F.R. § 103.2(b)(8)(iii). The NOID must provide "the bases for

4

the proposed denial sufficient to give the applicant or petitioner adequate notice and sufficient information to respond." *Id.* § 103.2(b)(8)(iv). Where USCIS intends to deny "based on derogatory information," the NOID will advise the petitioner "of this fact and offer[] an opportunity to rebut the information...before the decision is rendered." *Id.* § 103.2(b)(16)(i).

The Administrative Procedure Act, 5 U.S.C. §§ 500 *et seq.*, governs my review of a denial of adjustment of status. I may only set aside a decision if it is, *inter alia*, arbitrary and capricious or unsupported by substantial evidence. 5 U.S.C. § 706(2). Decisions will be arbitrary and capricious when the agency has:

> '[R]elied on factors which Congress has not intended it to consider, entirely failed to consider an important aspect of the problem, offered an explanation for its decision that runs counter to the evidence before the agency, or is so implausible that it could not be ascribed to a difference in view or the product of agency expertise.'

*Smith v. Garland*, 103 F.4th 1244, 1252 (7th Cir. 2024) (quoting *Motor Vehicle Mfrs. Ass'n of U.S., Inc. v. State Farm Mut. Auto. Ins. Co.*, 463 U.S. 29, 43 (1983)). "[A]n agency [must] do its homework; decisions that overlook relevant record evidence or lack a satisfactory answer do not pass muster." *Id.* For its part, "substantial evidence" is what "a reasonable mind would find adequate to support [the agency's] conclusion." *Ghaly v. I.N.S.*, 48 F.3d 1426, 1431 (7th Cir. 1995).

5

The APA also restricts my review to the reasoning in the agency's decision—I may not accept after-the-fact justifications for why evidence was disregarded or conclusions were reached, and I cannot do work that the agency did not perform in the first instance. *Orchard Hill Bldg. Co. v. U.S. Army Corps. of Eng'rs*, 893 F.3d 1017, 1024 (7th Cir. 2018); *SEC v. Chenery Corp.*, 318 U.S. 80, 95 (1943).

The motions before me are for summary judgment, but Federal Rule of Civil Procedure 56 does not modify the above standard of review under the APA. *J.N. Moser Trucking, Inc. v. U.S. Dept. of Lab.*, 306 F. Supp. 2d 774, 781 (N.D. Ill. 2004) ("[J]udicial review of an agency's final determination follows standards quite different from those applied in a typical summary judgment proceeding."). I decide the motions solely on the administrative record:

> When a party moves for summary judgment in such a judicial-review proceeding, he does not implicitly reserve a right to a trial if the motion is denied...The motion for summary judgment is simply the procedural vehicle for asking the judge to decide the case on the basis of the administrative record.

*Hunger v. Leininger*, 15 F.3d 664, 669 (7th Cir. 1994) (citations omitted).

## II.

Mrutu is a Tanzanian citizen. She entered the United States in August 2016 on a visa which allowed her to do religious work

with the Maryknoll Sisters in New York. Mrutu left the Maryknolls after only a month and traveled to Chicago to work as an in-home health aide. Sometime later, she began providing services to McLoughlin's neighbor. Mrutu and McLoughlin met and, in November 2018, they married. At the time, McLoughlin was 67 years old, and Mrutu was 42.

In January 2019, McLoughlin and Mrutu filed an I-130 and an I-485. Along with marriage and birth certificates, evidence of a joint bank account, and a transcript of a 1982 hearing granting McLoughlin a divorce from a previous spouse, they attached several dozen photographs of their life together. They then appeared for an interview with USCIS in August 2019. McLoughlin brought copious handwritten notes to the interview which included Mrutu's date of birth, the month the two of them met, and various other dates important to their relationship, as well as more esoteric data: "color of the house;" "street intersects my st.;" "have air conditioner—central air;" etc. ECF 25-ECF 26 (the Administrative Record, "AR") at 258-264. The USCIS officer evaluating their application had noticed that many of the photographs appeared to be from the same day (McLoughlin and Mrutu, as well as people in the background, were wearing the same clothes, for example) but were labeled with dates months apart. *Id.* at 151-201. The officer subjected both McLoughlin and Mrutu to cross-examination on this

subject, leading McLoughlin to say that the photographs must have been mislabeled, while Mrutu struggled to explain the contradictions. *Id.* at 248–251 (Mrutu); 253–257 (McLoughlin).

An officer for the Fraud Detection and National Security Directorate ("FDNS"), a division of USCIS, conducted a field investigation into the plaintiffs' marriage. The plaintiffs reported living together on Neva Avenue in Niles, Illinois, but USCIS had "received multiple anonymous tips stating that...[Mrutu] was not living with [McLoughlin] but was living at" an apartment complex on Ashland Avenue in Chicago. *Id.* at 119. The FDNS officer traveled to the Ashland Avenue address in April 2021. The officer questioned four residents of the complex. Three recognized Mrutu's photograph. They reported that she used to live at the complex but had not since 2020. The same three recognized McLoughlin. They told the officer that he had not lived at the complex and identified Mrutu as his caregiver, rather than his wife. *Id.* at 240–41. The FDNS officer also discovered that Mrutu had been the sole signer on leases at the Ashland Avenue complex from June 2018 to June 2020. *Id.* at 244–45.

The officer then traveled to the Neva Avenue address in Niles and questioned another neighbor. This person reported that McLoughlin lived alone on Neva Avenue and that he did not recognize Mrutu's photograph. The FDNS officer then went to McLoughlin's

8

home to interview him and received several responses that USCIS found troubling. McLoughlin told the officer that he had not seen Mrutu in five days, that he could not remember who had proposed to whom, and that Mrutu had no children when she in fact had two back in Tanzania. *Id.* at 243. The officer then "confronted [McLoughlin] with the fact that [the officer] was aware that MRUTU has never lived with him and that she has lived at different addresses other than with him," at which point McLoughlin "admitted that MRUTU also lives with a female friend in Chicago, Illinois but he did not know the address." *Id.*

USCIS sent McLoughlin a Notice of Intent to Deny letter in March 2023 citing the notes McLoughlin had brought to the interview, the mis-dated photographs and the cross-examination regarding them, and the results of the FDNS investigation. *Id.* at 117–120. Rather than responding with additional information, the plaintiffs withdrew their petitions. *Id.* at 109.

In June 2023, the plaintiffs submitted another pair of petitions. They omitted the photographs and added, *inter alia*, several joint bank statements and tax documents. *Id.* at 2200. USCIS found these additions unconvincing and denied the petitions in December 2023, citing at length the problems with the plaintiffs' August 2019 interview and the April 2021 FDNS investigation. *Id.* at 98–103.

In March 2024, the plaintiffs filed a third pair of petitions. This time, they attached several new documents dealing with USCIS's concerns with their prior performance, and they brought even more documents to an interview with USCIS on May 1, 2025. But USCIS issued a NOID later that month, again relying largely on the 2019 interview and the 2021 FDNS investigation. The NOID pointed out a few problems with the papers that the plaintiffs had brought to the May 2025 interview but largely ignored the ones attached to the original March 2024 petition. In June 2025, plaintiffs sent USCIS a response to the NOID in which they provided corrected copies of the documents from the interview and re-attached all of the evidence they had attached to their March 2024 petition. In October 2025, USCIS denied their petitions again, with reasoning echoing the May 2025 NOID.

Plaintiffs filed this suit on December 12, 2025, naming as defendants USCIS, Immigration and Customs Enforcement, and the directors of both agencies' Chicago field offices. In Counts I and II, they allege that USCIS violated the APA and the INA by denying McLoughlin's latest I-130 petition. In Count III, they allege that they have "both property and liberty interests" in the I-130 petition and that USCIS "violated their due process rights by ignoring probative evidence and failing to conduct a reasonable or adequate investigation of the facts." ECF 1 at 11. In Count IV,

they allege that the denial of their petitions violates their right to free association and Mrutu's right to petition under the First Amendment. And in Count V, in support of a request for injunctive relief, they allege that the Eighth Amendment prospectively prohibits Mrutu's detention by immigration authorities.

## III.

I first deal with several preliminary matters. Plaintiffs moved for summary judgment "on Counts I and II" and explicitly abandoned their constitutional claims in Counts IV and V. ECF 28 at 1. Defendants moved for summary judgment as to Counts IV and V, and I grant that motion. Defendants argue that I do not have jurisdiction to review the denial of Mrutu's I-485 petition (versus McLoughlin's I-130 petition). ECF 30 at 10–11. Plaintiffs write in their response to defendants' motion for summary judgment that they only mean to challenge the denial of the I-130. ECF 32 at 2 n.1. To the extent that plaintiffs advanced any claims about the I-485 denial, they have abandoned them, and I grant summary judgment to the defendants as to those claims at all counts.

Defendants moved for summary judgment as to Count III, where plaintiffs allege that the I-130 denial violated their Fifth Amendment rights. While plaintiffs only moved for summary judgment "on Counts I and II," their response to defendants' motion argues that "Plaintiffs' Count 3 States a Cognizable Fifth Amendment Due

Process Violation of a Property Right and a Liberty Interest." ECF 28 at 1; ECF 32 at 9. The complaint does not specify what kind of process is at issue, but plaintiffs make clear in their response to defendants' motion that they are referring to procedural due process: "'The fundamental requirement of due process is the opportunity to be heard at a meaningful time and in a meaningful manner.'" ECF 32 at 9-10 (quoting *Mathews v. Eldridge*, 424 U.S. 319, 333 (1976)). Plaintiffs assert that other circuits have flirted with the idea that petitioners may have a liberty or property interest in the adjudication of an I-130 petition and that such interests would be infringed by USCIS's having "ignore[d] probative evidence in their favor." *Id.* at 10. Plaintiffs then note that because they only moved for summary judgment as to Counts I and II, "they do not seek to fully brief their Fifth Amendment due process claims." *Id.*

Defendants rejoin, and I agree, that the Seventh Circuit has declined to find the plaintiffs' posited liberty or property interests in spousal immigration petitions. *Smith v. Garland*, 103 F.4th 1244, 1256 (7th Cir. 2024). Regardless, to whatever degree the Fifth Amendment protects plaintiffs' rights to procedural due process in immigration proceedings, the plaintiffs have received the process due them. *Id.* at 1255-56. I grant summary judgment to defendants as to plaintiffs' Fifth Amendment claim in Count III.

12

Finally, USCIS wrote in the October 2025 denial of plaintiffs' petitions, after finding that they had failed to show a bona fide marriage, "Furthermore, Ms. [*sic*] Mrutu is inadmissible to the United States for material misrepresentations pursuant to 212(a)(6)(C)(i) of the INA," meaning 8 U.S.C. § 1182(a)(6)(C)(i).[1] AR at 4. In order to assert inadmissibility on the basis of fraud or willful misrepresentation, the government must show that: "(1) the alien misrepresented a fact, (2) he did so willfully, (3) the misrepresentation is material, and (4) the alien procured an immigration benefit as a result." *Ascentic v. Sessions*, 873 F.3d 974, 980 (7th Cir. 2017). USCIS does not explain what misrepresentations it attributes to Mrutu in the decision. AR at 4. Defendants repeat in their motion for summary judgment that Mrutu was rendered inadmissible because of misrepresentations, but they do not elaborate, and they offer no other support for that assertion in any other filing. ECF 30 at 8; *see generally* ECF 31, ECF 37. Insofar as defendants' motion is based on this argument, it is denied.

---

[1] "Any alien who, by fraud or willfully misrepresenting a material fact, seeks to procure (or has sought to procure or has procured) a visa, other documentation, or admission into the United States or other benefit provided under this chapter is inadmissible."

**IV.**

I now turn to the meat of the matter, which is the allegation in Counts I and II: that defendants violated the INA and APA by denying McLoughlin's March 2024 I-130 petition. But there are two preliminaries here, too. First, there is a declaration that plaintiffs have attached to their motion, and second, the parties dispute under which part of the INA USCIS made its decision (and thus what burden applied).

**A. Preliminary Matters**

Plaintiffs attached to their motion a "declaration" from Mrutu which seeks to explain the results of the FDNS investigation in 2021. ECF 28-2. Defendants assert that the declaration falls outside of the exceptions to the rule that my review is confined to the administrative record. ECF 13 at 12 (citing *Protect Our Parks v. Buttigieg*, 39 F.4th 389, 402 (7th Cir. 2022)). That rule exists in part because I am evaluating the decision the agency made on the record before it at the time. *Dept. of Commerce v. New York*, 588 U.S. 752, 780–81 (2019). The declaration was not before USCIS in October 2025, and I do not take it into consideration.

Next, plaintiffs argue that USCIS denied the March 2024 petition pursuant to the sham marriage bar, while defendants maintain that the agency simply found that plaintiffs had failed

14

to meet their initial burden to prove by a preponderance that their marriage was bona fide.[2]

The record is clear. The May 2025 NOID cites only to the initial burden requirement and not to the marriage bar, and the October 2025 decision states that "we find that you have not met your burden of proof in demonstrating that your petition should be approved." AR at 10, 4. USCIS denied the petition on the basis that McLoughlin and Mrutu failed to meet their initial burden, not because it found the sham marriage bar applicable.

### B. APA Review

The question, then, is whether USCIS's determination that plaintiffs failed to show, by only a preponderance, that they intended to establish a life together at the time of their marriage was either lacking in substantial evidence or arbitrary and capricious.

### 1. The Evidence Presented

USCIS clearly found plaintiffs' performance at their August 2019 interview and the results of the 2021 FDNS investigation damning. The agency detailed both problems in the March 2023 NOID and the December 2023 denial. AR 116–120; 99–102. The agency also

---

[2] Both parties believe that my review under the sham marriage bar standard would be more favorable to plaintiffs.

made plain that it took a dim view of plaintiffs' failure to supply documents showing commingled finances (like tax documents which had actually been filed with the IRS). *Id.* at 102–03.

Plaintiffs targeted those deficiencies with the attachments to their March 2024 petitions. The first of these was an evaluation of McLoughlin by a Dr. Geoffrey Shaw. AR at 1143–46. Dr. Shaw interviewed McLoughlin at home and concluded that he had been suffering from progressively worsening dementia since at least 2019. Dr. Shaw opined that McLoughlin's illness would explain his poor performance in interviews, in part because "when unable to provide specific pieces of information," McLoughlin would "fill the gaps with information that is relevant but not necessarily accurate." *Id.* at 1145. Dr. Shaw wrote that the dementia could account for McLoughlin's voluminous (and strange) notes at the August 2019 interview. *Id.* at 1144–45.

Second, plaintiffs submitted a statement from Mrutu claiming that the Ashland Avenue apartment was not a place at which she lived apart from McLoughlin but rather a space she rented from which to run a side business in reflexology. She also noted that her and McLoughlin's living arrangements around the time of their marriage were unconventional—she worked as a live-in aide with her clients during the week, so she lived with McLoughlin only on weekends, which they would spend either at his Neva Avenue address

16

or at the apartment on Ashland. *Id.* at 1152. This was in the way of explaining what McLoughlin told the FDNS officer during the 2021 investigation: that Mrutu had not been home for several days and that she "also live[d] with a female friend in Chicago," although he did not know at what address. *Id.* at 243.

The third attachment was what purported to be McLoughlin's will, bequeathing his estate to Mrutu, dated shortly after their marriage.[3] Fourth were transcripts for the plaintiffs' jointly-filed tax returns from 2020–2022. Fifth was a smattering of documents showing joint bank accounts, joint utility bills, and archdiocesan and American Rescue Plan letters addressed to both plaintiffs at the Neva Avenue address.[4] Sixth was a set of seven signed statements from friends, neighbors, and a tax preparer all attesting to the genuineness of the plaintiffs' marriage. Seventh and finally, they attached forty-three photographs of themselves engaging in various domestic and recreational activities. On inspection, this set of pictures does not seem to suffer from the 'taken-all-on-the-same-day' issue that the photographs attached to

---

[3] As defendants point out, the document does not meet the requirements of an operative will. ECF 37 at 5.

[4] That is, a letter from the Biden administration announcing COVID-19 relief payments pursuant to the American Rescue Plan Act, Pub. L. 117-2 (2021).

17

the plaintiffs' 2019 petitions did. *Id.* at 1039–1042 (listing attachments), 1143–1218 (non-photographic attachments), 927–960 (the photographs).

When plaintiffs showed up for their interview on May 1, 2025, they turned over several more documents in the same vein: a 2024 IRS form 1040 filled out for joint filing; a Certification for Surrogate Decision Making empowering Mrutu to make healthcare decisions for McLoughlin; a Practitioner Order for Life Sustaining Treatment form for McLoughlin signed by Mrutu; an email from Mrutu arranging a neurology appointment for McLoughlin in April 2025; a flier and an invoice from an adult care service run by Lutheran General Hospital in Des Plaines showing Mrutu paying for McLoughlin's care; a set of emails between Mrutu and her counsel attempting to arrange medical care for McLoughlin; and more photographs of plaintiffs on outings or around the house.

### 2. The Agency's Treatment of the Evidence

There are three sets of documents from the plaintiffs and two pieces of decision-making from USCIS at issue. For clarity's sake, I will start with how the May 2025 NOID and October 2025 denial dealt with the original March 2024 petition, and then I will turn to how they addressed the documents plaintiffs submitted in May and June 2025.

The only document attached to the March 2024 petition that the NOID mentioned at all was Dr. Shaw's evaluation. *Id.* at 8. The NOID did not accept or contest the way the evaluation could explain McLoughlin's poor performance in 2019 and 2021. Instead, it had two notes. First was to remark that while the plaintiffs wrote in their petitions that McLoughlin had no children, "the evaluation indicated that [McLoughlin told Dr. Shaw during their interview that he] had 5 children." *Id.* Second was to point out that the "Illinois Department of Financial and Professional Regulation website" listed Dr. Shaw's license and specialty certification as expired. *Id.* at 9. As for the rest of the March 2024 attachments, the NOID was silent. *Id.* at 7–11.

Noticing this omission, plaintiffs' counsel reattached to his June 2025 response to the NOID everything that had been attached to the March 2024 petition. *Id.* at 1020. Counsel also included copies of Dr. Shaw's up-to-date license and certifications, along with a new statement from Dr. Shaw clarifying that McLoughlin's claim to have five children—when he had none—was confabulation typical of dementia.[5] *Id.* at 982–987. USCIS's October 2025 decision, like the NOID, failed to address all but one of the

---

[5] McLoughlin had no children with his prior spouse. That was his testimony at his divorce proceeding in the 1980s, presumably before he was afflicted with dementia. AR at 1127.

19

documents attached to the 2024 petition and reattached to the June 2025 follow-up letter. *Id.* at 1–6. The decision, like the NOID, at least mentioned Dr. Shaw, but failed to accept or contest his conclusions. And the decision once again mentioned the five children, apparently ignoring Dr. Shaw's new statement. *Id.* at 2.

Unlike with the March 2024 attachments, however, the agency *did* address the documents that plaintiffs handed over at the May 1, 2025, interview. The NOID raised concerns with each of them. It dealt with the tax documents in this way:

> [Y]ou submitted the copy of 2024 IRS Form 1040 under both names. However, there is no evidence to prove that this form was actually submitted or filed with the IRS. You submitted the copy of the beneficiary's W2's [*sic*], however, you failed to submit the petitioner's Form 1099-R, Distribution From Pensions, Annuities, Retirement or Profit-Sharing Plans, IRAs, Insurance Contracts, etc.. [*sic*] The Form 1040 indicates that you owe $26, 080 [*sic*] to IRS, you have failed to shows [*sic*] evidence that it was already paid, how it was paid and who paid for it.

*Id.* at 9. The NOID did not explain why the agency needed the W2 or 1099-R. The NOID noted that the Certification for Surrogate Decision Making and Practitioner Order for Life Sustaining Treatment forms had not been signed by a physician. *Id.* Responding to the documents showing Mrutu coordinating McLoughlin's care, the NOID complained that, instead of caring for him full time, Mrutu was instead paying for his care with her salary from "taking care of someone else" as an in-home health aide. *Id.* And as for the

emails Mrutu sent arranging care for McLoughlin, the NOID read that it "appears that these emails were sent not for medical purposes but for immigration purposes," and that there was "no evidence submitted if the petitioner's medical issues have/had been resolved by the immigration lawyer(s) or by anyone..." *Id.* [6]

Following the NOID, Mrutu sent USCIS a letter. Among other points, the letter attempted to explain part of the FDNS investigation in 2021. In it, Mrutu wrote that the investigating officers "asked one of the neighbors about me but because they didn't introduce themselves as immigration officers, the neighbor didn't tell them the truth, because he didn't know who they were and what their intention was." *Id.* at 1227. The letter also asked why the investigators had not just entered the house on Neva Avenue: "If they entered inside, they could find the evidence that I indeed live there: my clothes, shoes, and other things normally women use were and are there." *Id.* at 1226–27.

In his June 2025 follow-up letter, plaintiffs' counsel submitted documents meant to allay USCIS's concerns in the NOID,

---

[6] In one email, Mrutu is arranging Dr. Shaw's evaluation with her attorneys. In the remainder, she is asking them to advise her as to how she could legally coordinate care for McLoughlin when his dementia led him to refuse necessary medical treatment. As she says, "I understand that this is a different case from the immigration one." AR at 1299–1303.

21

including a copy of Mrutu's May 2025 letter, jointly-filed tax transcripts from 2023 and 2024 (instead of the unfiled 1040), a corrected version of the Practitioner Order for Life Sustaining Treatment form signed by a Dr. Amelia Conte-Russian, and an additional document from Dr. Conte-Russian stating that she provides ongoing treatment (coordinated by Mrutu) to McLoughlin. *Id.* at 1028-1030 (listing exhibits); 961-1012 (the exhibits themselves).

The October 2025 decision's engagement with these documents was minimal. After rehashing the FDNS investigation, the decision provided a bullet-pointed list of the evidence from the May 2025 interview copied and pasted from the NOID. *Id.* at 2-3. It then set out a second set of bullet points which listed, but did not analyze, the documents attached to the June 2025 letter. The decision never mentioned Mrutu's letter explaining the FDNS investigation. The sum total of the reasoning that followed the two lists was:

> After reviewing the evidence and the testimony provided at the interview [presumably, this is the 2019 interview, given that the agency never discusses the 2025 interview], our records indicate that the beneficiary is not eligible for the requested benefit.

> After a thorough investigation USCIS Officers determined that Mr. McLaughlin [*sic*] and Ms. [*sic*] Mrutu entered into a marital relationship solely to circumvent immigration laws. Based on the totality of the evidence gathered Ms. [*sic*] Mrutu entered into a marital

22

relationship with Mr. McLaughlin [*sic*] to circumvent immigration laws.

*Id.* at 4.

### 3. The Review Itself

The threshold for arbitrariness and capriciousness is low, but an agency must at least "consider[] the relevant factors" and "examine the relevant data" in reaching its decision. *Indiana Forest All., Inc. v. U.S. Forest Serv.*, 325 F.3d 851, 858–59 (7th Cir. 2003) (citations omitted). And in making its decision, an agency should reach its "own independent conclusion based on the evidence before [it]," rather than giving "conclusive effect to determinations made in a prior proceeding." *Matter of Tawfik*, 20 I. & N. Dec. 166, 168 (1990).

But the 2025 NOID and decision are based almost entirely on the USCIS's previous determinations. The agency spent most of the NOID recapping plaintiffs' prior petition attempts, and the decision's scanty analysis boils down to reliance on a "thorough investigation," which, given that the decision provides no other details, is presumably the FDNS investigation from 2021. AR at 4. The agency simply ignored most of the new evidence presented in plaintiffs' March 2024 petition; the extent of its engagement with the rest of that evidence was just to list it without analysis. This is a problem, because it is unlikely that an agency has sufficiently considered the relevant data regarding a marriage

when it omits evidence which "weighs directly against the finding of marriage fraud." *Bristow v. Mayorkas*, 2024 WL 1328825, *1, *8 (N.D. Ill. Mar. 28, 2024).

The first time that defendants have grappled with most of the evidence has been in this litigation. Defendants discount Dr. Shaw's conclusion that McLoughlin's dementia dated back five years: "Yet there really was just this conclusion, and no evidence to support it provided to USCIS." ECF 30 at 28. They write that the 2023 and 2024 tax returns plaintiffs' counsel attached to the June 2025 follow-up letter "may have cleared some of these issues [in the NOID] up" but that the additional evidence of joint finances was outweighed by the 2021 investigation and 2019 interview. *Id.*

Defendants contend that the withdrawal of plaintiffs' 2019 petitions "led the agency to raise its eyebrows," apparently creating a credibility problem that would taint its evaluations of any future applications. ECF 31 at 6. They compare leases Mrutu signed to cast doubt on the dates she claimed to live at the Neva Avenue address with McLoughlin. *Id.* at 7–8. They write about the effect that McLoughlin's dementia might have had on the validity of his signature but only deal with its implication for his performance interviews with USCIS officers by begging the

24

question: "And there is no need to challenge the diagnosis because the marriage was not valid at inception." *Id.* at 9-11.

Defendants discount the purported will because of its legal deficiencies. ECF 37 at 5. They point to inconsistencies in the dates plaintiffs wrote for Mrutu's occupation of the Neva Avenue address and attack the tax transcripts as revealing that Mrutu never reported income as a reflexology therapist (thereby casting doubt on her having done reflexology at the Ashland address). *Id.* at 6-7.

Whatever their merits, the trouble with these arguments is that they do not appear in USCIS's NOID or decision. In the same way that I cannot go beyond the administrative record to examine the "declaration" plaintiffs attached to their motion for summary judgment, I may not go beyond the reasoning the agency included in its actual decision-making. *SEC v. Chenery Corp.*, 318 U.S. 80, 95 (1943) ("We merely hold that an administrative order cannot be upheld unless the grounds upon which the agency acted in exercising its powers were those upon which its action can be sustained."). Even if the arguments defendants now offer were particularly persuasive, I cannot "accept post-hoc rationalizations for why certain evidence was supposedly disregarded" because I may not "'make up for deficiencies in the agency's reasoning.'" *Sodel v.*

*USCIS*, 2025 WL 843401, *1, *6 (N.D. Ill. Mar. 17, 2025) (quoting *Orchard Hill*, 893 F.3d at 1024).

On this record, I cannot find that USCIS has done "its homework." *Smith*, 103 F.4th at 1252. Rather, it has "overlook[ed] relevant record evidence," meaning that its decision "do[es] not pass muster." *Id.*

Plaintiffs argue that their situation mirrors that of the couple in *Sabhari v. Frazier*, 2007 WL 295261, at *1 (D. Minn. Jan. 30, 2007), and I agree that there is at least a resemblance. In that case, USCIS's investigation into the couple's first I-130 petition was also damning. The beneficiary had previously been married in Kuwait, and when USCIS called his ex-wife, she and other family members told the agency that the beneficiary had divorced her to engage in a sham marriage with the citizen petitioner. *Id.* at *1-*2. USCIS denied that first petition and a second one based on the statements from the ex-wife and other family members in Kuwait. *Id.* at *2-*3.

The couple filed a third I-130 petition, this time supported by recantations from the Kuwaiti family members, who admitted they had made their original claims because they were angry the beneficiary had abandoned them and would have done "anything to get [him] back to Kuwait." *Id.* at *4. USCIS denied the petition again. *Id.* The couple took their case to federal court, and because

26

of procedural complexities not now germane, the court remanded the case to USCIS with instructions to conduct a "fresh and searching determination as to the validity" of the I-130 petition. *Id.* at *5. USCIS denied the petition again, writing that, "[A]lthough [a] period of ten years has passed since [the original I-130 petition], it is not possible to wash out the threads of fraud upon which the marriage was based." *Id.* at *5.

The court found that it was "arbitrary, capricious, and an abuse of discretion...to hold steadfastly to [the] previous sham marriage determination" in the face of the evidence the couple had put forward, including the sheer length of the marriage, "joint lease and purchase agreements, joint income tax returns, joint bank statements, joint credit card accounts, statements from friends and family members, and pictures of the [petitioners] together," along with the results of an unannounced "bed check" which showed the petitioners were living together.[7] *Id.* at *13.

---

[7] "To help determine whether a marriage is bona fide, the [Immigration and Nationalization Service] may conduct bed checks where agents will show up unannounced in the middle of the night or early morning to see whether the couple is living together." *Sabhari*, 2007 WL 295261, at *4 n.3.

It strikes me that USCIS could have put much of this case to rest if, instead of relying for so long on the 2021 FDNS investigation, it had conducted a bed check at some time in the intervening five years.

27

In the instant litigation and the underlying petition, USCIS has likewise "steadfastly" held to conclusions it reached half a decade ago. It is plain in the 2025 NOID and decision that USCIS declined to engage with the vast bulk of the plaintiffs' attachments. It was arbitrary and capricious to ignore those new documents. *Smith v. Garland*, 103 F.4th at 1252. Likewise, given the breadth and evidentiary strength of those attachments, USCIS's unreasoned decision that plaintiffs had not proved even by a preponderance that they are parties to a bona fide marriage lacked substantial evidence. *See Sabhari*, 2007 WL 295261 at *13. This was not a case of an "agency explain[ing] its decision with less than ideal clarity," but virtually failing to explain it at all. *Alaska Dept. of Envt. Conservation v. EPA*, 540 U.S. 461, 497 (2004) (citations omitted).

**V.**

Plaintiffs' motion for summary judgment is granted as to Counts I and II and denied as to Counts III–V. Defendants' cross-motion for summary judgement is denied as to Counts I and II and granted as to Counts III–V. Like the court in *Sabhari*, I remand this case to USCIS with instructions to conduct a "fresh and searching determination." 2007 WL 295261 at *5.

**ENTER ORDER:**


_____

**Elaine E. Bucklo**
United States District Judge
Dated: May 8, 2026